## Case No. 12,372.

### The SAUNDERS.

[2 Gall. 210.] 1

Circuit Court, D. Massachusetts. Oct. Term, 1814.

**NONINTERCOURSE — USING BRITISH LICENSE— VOYAGE ENDED.**

1. Under the second section of the act of Aug. 2, 1813, c. 56 [12 Weightman's Laws, 225; 3 Stat. 85], prize allegation cannot be sustained for using a British license, unless the vessel be seized in delicto, during the voyage. If the voyage be entirely ended, the offence is purged.

[Cited in Rogers v. The Amado, Case No. 12,-005.]

2. Quære: How it would be on an information on the first section of the same act.

This was an information in the nature of a prize allegation, founded on the second section of the act of August 2d, 1813 (chapter 56). The allegation in substance charged, that the said brigantine Saunders, was, at the port of Greenock in Scotland, employed in an illegal intercourse with the enemies of the United States, in the month of November, 1813; and in the same month, proceeded from said Greenock, with a full cargo on board, purchased and received from enemies of the United States, under the protection of a license from the government of Great Britain, to the port of Corunna in Spain, where the said cargo was sold and disposed of; and afterwards, under the protection of the same license, departed in ballast from Corunna for the United States, and arrived at New Bedford, on the 10th of March, 1814; and, on the 5th day of the ensuing April, was seized at

1 [Reported by John Gallison, Esq.]

said port by the collector of the customs.

The claim, and accompanying affidavit, which were admitted to contain all the material facts, asserted in substance, that on the '10th day of October, 1812, the brig sailed from the Capes of the Delaware with a cargo of flour owned partly by the claimants [Lewis & Co.], and partly by Spanish subjects, bound for Teneriffe, and from thence to Philadelphia, having on board, for her protection during the voyage, a British license, countersigned and vouched by Don Onis, the unaccredited minister of Spain; that on the 17th of November following, she was captured by the British letter of marque, the Monarch, and ordered for Greenock, but, during the voyage, was by stress of weather compelled to go into Madeira, where a part of the cargo was taken out, and with the residue, the captors proceeded in the brig to Greenock; that after her arrival at Greenock, the brig was libelled as prize, and pending the prize proceedings, the cargo was sold as perishable by order of the admiralty; that the brig was detained until the 6th of August, 1813, when restitution thereof, and of the cargo, were decreed on payment of the costs of the captors; that by various accidents the brig was detained at Greenock until the 25th of November following, when she sailed for Philadelphia in ballast; that in the course of the voyage, she was compelled by stress of weather to put into Corunna for repairs: and after refitting, she sailed from that port, and arrived at New Bedford on the 12th of March, 1814, without having touched at any other ports during the voyage; that at the last port the voyage was terminated, the crew were discharged, and the brig hauled up, and all her papers and documents delivered to the owners or their agents; and afterwards, and not before, the seizure was made by the collector.

Mr. Blake, Dist. Atty.

There are two grounds of forfeiture: (1) An offence committed, to which the forfeiture is annexed as a penalty. (2) The using of a British license, by which the vessel lost her American character, and became quasi enemy's property. The objection, that the vessel was not liable to seizure after the completion of her voyage, involves the absurdity, that her being forfeited or not depended upon mere chance or fortune. Upon this principle, a vessel, which would have been good prize, if taken on the high seas, will, if so successful as to run the gauntlet and get safe into port, be secure from seizure and forfeiture. Admitting even that in the hands of an innocent vendee, the vessel might be protected, yet that is not the present case; for she remained, until the time of the seizure, the property of the same persons, who owned her on the voyage. By the act of the 2d of August, 1813, c. 56, § 2 (12 Laws [Weightman's Ed.] 225 [3 Stat. 85]), all vessels using an enemy's license are made good prize of war. As it is not denied that the Saunders sailed

under the protection of an enemy's license, it is difficult to discover any reason for her being exempt from forfeiture; especially, when the rights of no innocent persons will be affected. The license, it is true, was not on board at the time of the seizure, but, being permanent, it must be considered as still in the use of the vessel. It was in the possession of the master or owner, and was as much a document belonging to the vessel, as her American register.[2]

W. Sullivan, for claimants.

The license is plainly limited to a single voyage, and at the time of the seizure, had lost all its effect, so that the vessel could not again have sailed under its protection. If the vessel is subject to condemnation, it must be either as enemy's property, or for having traded with the enemy. This, being a prize allegation, must be governed by the ordinary rules of prize proceedings. Now no rule is better established, than that the papers and the evidence of persons on board are to be first examined. But in this case all the papers were lodged at the custom-house, and if produced, they would prove the vessel to be American property. No papers have been offered by the libellant, and no examination of persons, except of one man, which was taken seventy-eight days after the ship's arrival. This evidence is not admissible, and there then remains no evidence, upon which the process can be maintained. There is no doubt that the vessel was American when she sailed, being documented and cleared as such. She is not then enemy's property, unless by reason of some act indentifying her with the enemy. It is not denied, that by the general law, this vessel would have been subject to capture and condemnation as prize, if found on the high seas with a license of this description. But a distinction is to be made between the moral agent, who commits the offence, and the instrument with which it is committed. The person is liable to punishment at any distance of time, but the thing must be seized flagrante delicto, in the very act of committing the offence. No instance, it is believed, can be found of a seizure as prize after the complete termination of the enterprise. The confiscations, or condemnations for intercourse with prohibited ports, &c., under the restrictive system, were by statute. It being expressly provided, that certain penalties should follow certain acts, if the acts were done, the liability was incurred, and the forfeiture might be exacted at any distance of time. But it is not so with the act, on which this process is founded. It merely declares, that under certain circumstances, a vessel shall be deemed an enemy's vessel and be treated as such. In addition to this, no authority to seize, even when all the circumstances exist, is given to the collector.

---

[2] [The reporter was absent during a part of Blake's argument.

STORY, Circuit Justice (after reciting the facts). Upon these facts, the question presented for the decision of the court is, whether, under the second section of the act of the 2d of August, 1813 (chapter 56), the said brig is liable to seizure and condemnation, for having had and used a British license on a voyage, which was, at the time of the seizure, completely terminated. This section provides, that any ship of the United States, sailing under, or found on the high seas using, a British license, shall be considered and held, as sailing under the flag of the government of Great Britain, and may be seized on the high seas or elsewhere, by the public or private armed ships of the United States, and upon due proof thereof be, together with her cargo, condemned to the use of the captors, and the proceeds distributed according to the rules prescribed in the cases of prizes made from the enemy. This section must now be taken to have been made merely in affirmance of the general law of prize; and, in its terms, it is confined to captures made by commissioned ships, during the existence of the illegal voyage. It is the actual use of the license, at the time of the seizure, and not the former use in a previous voyage, which authorizes the search and capture. The authority to seize, also, is given only to commissioned ships, and is not extended to the mere civil officers of the government. Upon the express provisions of this section, therefore, the case cannot be sustained. It must stand, if at all, upon the general law of prize, and the right of the United States to enforce the prerogatives of war against all, who shall offend against them, and, in a more special manner, the execution of their own laws against their own citizens. Admitting then, what indeed cannot be denied, that the sailing under a British license subjects a vessel of the United States to be deemed as sailing under the enemy's flag, it remains to be considered, whether the forfeiture continues to attach, although the hostile character so acquired be completely gone. In cases of breaches of blockades, and of contraband of war, the doctrine seems to be established, that the vessel must be captured in delicto; otherwise the offence is purged. The Imina, 3 C. Rob. Adm. 167; The Lisette, 6 C. Rob. Adm. 387. If, therefore, the port of destination have become neutral, or the blockade have been raised, before the capture, the corpus delicti is deemed to be extinguished. The same principle has been applied, where the intention was to trade with the enemy; if, at the time of carrying the design into effect, the person is no longer an enemy, or the port no longer hostile, the offence is not committed; for there must be both intention and act. The Abby, 5 C. Rob. Adm. 251.

It strikes me, that the present case must be decided upon analogous principles. No case has been adduced, in which the penalty has been inflicted for an illegal traffic with the enemy, upon the mere footing of the prize

law, unless where the vessel has been captured during her delinquency. The very silence of the books, in such a case, furnishes some argument against the existence of a rule, which should attach an indissoluble taint. The reasonable principle, to be extracted from the authorities, would seem to be, that so long as you retain the hostile character by your illegal conduct, either in contraband trade, in violation of blockade, or in hostile intercourse, you shall be subject to all the penalties of such character. But when without fraud, you have resumed your real national character, it purges away all the noxious qualities, which previously infected it. In the case before the court, it is clear, that, during the voyage, the vessel might have been seized and condemned, as an enemy's vessel, sailing under an enemy's flag. But at the time of her seizure, Her American character had re-attached. She was no longer engaged in hostile traffic, or sailing under an enemy's license, or using an enemy's protection. In no respect was she, then, to be deemed an enemy's vessel. I hold, therefore, that not having been taken in delicto, the prize law would not adjudge her good and lawful prize.

I give no opinion, how the law would be in a case founded on the first section of the act of the 2d of August, 1813 (chapter 56). There may be a material distinction, founded on the language of that section. The forfeiture there imposed is absolute, without reference to the time of seizure. Nor do I give any opinion as to a case, where, by fraudulent suppression or false destination, the forfeiture could not be inflicted on the original voyage, and, under such circumstances, is sought to be enforced on a capture in a subsequent voyage. See The Christiansberg, 6 C. Rob. Adm. 376.